UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVID RANDOLPH SCOTT,

          Plaintiff,

    v.

CITIZEN WATCH COMPANY OF
AMERICA, INC., et al.,

          Defendants.

Case No. 17-cv-00436-NC

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY
JUDGMENT**

Re: ECF 81, 93

      This case is about a famous astronaut, that astronaut's space-faring chronograph, and a modern wristwatch marketed as a commemorative celebration of history. The question is whether the watch's manufacturer and a downstream retailer—defendants Citizen Watch Company of America, Inc. and Sterling Jewelers, Inc., respectively— violated the law by using advertisements that include plaintiff Colonel David Randolph Scott's name, title, photo, and voice without his permission. While California misappropriation laws and the federal Lanham Act do permit certain types of unauthorized uses of another's identity, Defendants cannot show that those exceptions apply here as a matter of law. Instead, factual disputes exist about the incidental nature of Defendants' use of Scott's identity and about what Defendants' advertisements suggest to consumers regarding the relationship between Scott and the commemorative watch.

      These factual disputes bar summary judgment on most of Scott's claims, but there is a dearth of evidence supporting Scott's assertion that he has suffered severe emotional

distress. Thus, Defendants' motions for summary judgment are GRANTED on Scott's claims for negligent and intentional infliction of emotion distress, and DENIED on all other claims.

# I. BACKGROUND

## A. Parties

The plaintiff in this case is Colonel David Randolph Scott, a retired astronaut and the mission commander for NASA's 1971 Apollo 15 voyage. On that mission, Scott spent three days on the moon, including over 18 hours outside the main spacecraft on lunar extra-vehicular activity. Scott is perhaps best known for being the seventh man to walk on the moon.

Defendant Citizen Watch Company of America, Inc. ("Bulova") is a watch manufacturer, and defendant Sterling Jewelers, Inc. dba Kay Jewelers ("Kay") is a watch and jewelry retailer that sells Bulova watches.

## B. The Original Chronograph and the Moon Watch

Before the Apollo 15 mission, Bulova representatives gave Scott two Bulova timepieces to use in space. One of them, a chronograph, Scott wore to the moon during the Apollo 15 mission. In October 2015, Scott auctioned off the chronograph for $1,625,000.

In 2014, Bulova began creating a commemorative timepiece—the Lunar Pilot Chronograph (the "Moon Watch")—based on the original chronograph that Scott wore to the moon. In early 2016, Bulova began marketing the Moon Watch. Many of the advertisements and promotional materials that Bulova and Kay used to advertise the Moon Watch make reference to the original chronograph that Scott wore on the moon, and include Scott's identity in various forms. These marketing materials are the basis for this lawsuit. The disputed materials include: (1) online promotions of the Moon Watch, including descriptions of the watch, photos of Scott, and a video that contains an audio clip of Scott's voice; (2) a promotional booklet packaged along with the Moon Watch; and (3) other public and internal communications by Bulova and Kay.

### 1. Online Marketing

The first category of materials is Defendants' online marketing of the Moon Watch. Bulova and Kay both included references to Scott in descriptions of the Moon Watch on their own websites, and Bulova's site features photos of Scott and a video containing audio of Scott's voice.

Bulova's web page has had several iterations of the Moon Watch description, two of which reference Scott. Originally, the web page stated: "This Special Edition Moon Chronograph Watch replica takes inspiration from astronaut Dave Scott's personal Bulova chronograph worn during the Apollo 15 moon landing." Napolitano Decl. (ECF 81-1) Ex. 3. Bulova later changed the description to read: "After Apollo 15's mission commander made lunar history—while wearing his personal Bulova chronograph—we're making history again. The Bulova Moon Watch replicates that original timepiece . . ." *Id.* Ex. 4. Bulova then changed the description again to state: "Bulova made space history on August 2, 1971—during the Apollo 15 mission, a moon pilot chronograph, customized for lunar conditions by Bulova engineers, was worn on the moon. Now Bulova makes history again with the special edition Moon Watch . . ." *Id.* Ex. 5. Bulova sent copy listing the Moon Watch for sale on its downstream retailers' websites with descriptions similar to those above. Ryan Bul. Decl. (ECF 102-1) Ex. G.

Based inexactly on the copy that Bulova sent to Kay, Kay's website stated: "This special edition moon watch replica takes inspiration from astronaut Dave Scott's personal Bulova chronograph worn during the Apollo 15 moon landing . . ." Ryan Kay Decl. (ECF 104-1) Ex. B. This description is similar, but not identical, to the copy Bulova sent. *See id.* Ex. A.

Beyond the online watch descriptions, Bulova's website features photos of Scott and a video that uses Scott's voice. The 79-second video depicts the Apollo 15 mission and includes two seconds of audio where Scott can be heard saying, "We have a roll program." Ryan Bul. Decl. Ex. W. The web page also shows black and white photographs of an astronaut, who the parties agree is Scott, in full space gear including a helmet and visor

that completely obscure Scott's face. *Id.* Ex. X.

### 2. The Booklet Accompanying the Moon Watch

Enclosed in the Moon Watch's packaging is a booklet providing a watch description and specifications similar to those on Bulova's website, and featuring the same photos of Scott. The first version of the booklet included the image of Scott in a full spacesuit, including visor and helmet, along with the Lunar Rover that was used on several NASA missions. Napolitano Decl. Ex. 2.[1] The booklet stated: "Apollo 15's mission commander, the seventh man to walk on the moon and the first to drive the Lunar Rover, wore his personally-gifted Bulova moon pilot chronograph." *Id.*

Bulova later removed the reference to "mission commander" and revised the description to say: "The Bulova moon pilot chronograph, worn during the Apollo 15 moon landing . . ." *Id.* Ex. 1. The updated booklet still includes the photograph of Scott on the moon. *Id.*

Although the booklet is provided to purchasers as part of the Moon Watch's packaging, it was also used at least once as an in-store display. *See* Ryan Bul. Decl. Ex. U (email and photos from a Kay employee showing the booklet prominently featured as part of the Moon Watch's in-store display).

Related to the booklet, the Moon Watch also comes with a card "certify[ing] that this timepiece is an authentic replica of the original Bulova chronograph watch worn on the moon by Apollo 15's mission commander in 1971." *Id.* Ex. V.

### 3. Other Communications

In addition to the online advertisements and the promotional booklet, Scott identifies several other instances where Defendants incorporated Scott's name and/or title into their internal marketing strategies and communications with the public. For example, Scott's name appears in a 2015 press release from Bulova about the Moon Watch; in an

---

[1] The physical exhibits of the booklets sent to chambers appear to be labeled in reverse order. The booklet filed as Exhibit 1 to the Napolitano declaration is the revised version, with reference to "mission commander" omitted. The booklet filed as Exhibit 2 is the original, with references to "mission commander." *See* ECF 81-2.

interview of Bulova's CEO Jeffrey Cohen with Baselworld reporter Bill Shuster; and in an internal proposed "advertorial" that emphasizes the connection between Bulova and NASA. *Id.* Exs. F, J, K. Similarly, several communications refer to the "mission commander" of Apollo 15, including in public advertisements, internal training cards or "tips cards" for sales employees, and Bulova's "pitch book." *Id.* Exs. O, Q, R.

### C. Procedural History

Perturbed by the inclusion of his identity in Defendants' advertising materials, Scott sued Bulova and Kay, asserting nine causes of action. First Amended Complaint (FAC) (ECF 9). After the Court dismissed Scott's ninth cause of action for unjust enrichment, ECF 62, eight claims remain: (1) common law invasion of right of publicity through commercial appropriation of name and likeness; (2) common law invasion of right of privacy; (3) violation of California Civil Code § 3344; (4) false advertising under the Lanham Act, 15 U.S.C. § 1125; (5) false designation of origin under the Lanham Act, 15 U.S.C. § 1125; (6) negligence; (7) intentional infliction of emotional distress; and (8) negligent infliction of emotional distress.

Bulova moves for summary judgment on all of Scott's claims.[2] Bul. MSJ (ECF 81). In a separate motion, Kay joins Bulova's motion on all counts and offers additional arguments why Kay should be granted summary judgment. Kay MSJ (ECF 93). Scott opposes both motions. Opp. to Bul. MSJ (ECF 125); Opp. to Kay. MSJ (ECF 127).

All parties have consented to magistrate judge jurisdiction under 28 U.S.C. § 636(c). ECF 8, 22, 23.

## II. LEGAL STANDARD

"Viewing the evidence in the light most favorable to the non-moving party, summary judgment is appropriate if no genuine issues of material fact remain and the non-

---

[2] Bulova also moves to exclude the export report of Larry Steven Londre and the expert declaration of Doug Bania. ECF 113, 114. These motions are denied, because the challenges to both experts go principally to the weight, not admissibility, of the experts. The Court ignores both witnesses to the extent they offer an opinion on what the law is. The denial of these motions is without prejudice to re-urging as a pre-trial *Daubert* motion.

moving party is entitled to judgment as a matter of law." *Lockheed Martin Corp. v. Network Sols.*, Inc., 194 F.3d 980, 983 (9th Cir. 1999); *see* Fed. R. Civ. P. 56.

## III. DISCUSSION

The Court first addresses Bulova's motion for summary judgment on all of Scott's claims, and then summarily addresses the portions of Kay's motion not covered by Bulova's. For ease of reference and because Kay joins Bulova's motion, both defendants' liability is assessed in conjunction with Bulova's motion.

### A. Scott's Common Law and Statutory Appropriation Claims Involve Disputed Material Facts.

The Court first considers Scott's common law and statutory appropriation claims. The parties dispute whether Scott's first two causes of action—which Scott has deemed "common law invasion of right of publicity through commercial appropriation" and "common law invasion of right to privacy"—are really a single claim. *See* Bul. MSJ at 9; Opp. to Bul. MSJ at 5. California law recognizes both types of common law misappropriation claims, with the difference being the harm the plaintiff suffers: lost opportunity to benefit commercially from his own public identity on the one hand, and injury to feelings or peace of mind on the other. *See Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 541–42 (1993); *accord McKinney v. Morris*, No. B240830, 2013 WL 5617125, at *19 (Cal. Ct. App. Oct. 15, 2013). However, the legal elements are the same for both claims, and the same factual issues underlie them in this case, so the Court addresses them together. *See Dora*, 15 Cal. App. 4th at 542 ("Because we believe that in this case the analysis under both theories would be the same, we need not put too fine a point on it.").

In addition to the common law cause of action, California Civil Code § 3344 provides a statutory remedy for commercial misappropriation. The remedies under § 3344 complement, rather than codify, the common law claim. *See Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 691–92 (9th Cir. 1998). Section 3344 provides in relevant part, "any person who knowingly uses another's name, voice, signature, photograph, or likeness, in

Case No. 17-cv-00436-NC          6

any manner . . . for purposes of advertising . . . without such person's prior consent . . . shall be liable for any damages sustained by the person." Cal. Civ. Code § 3344(a).

On the common law misappropriation claim, Scott must prove that: (1) Defendants used Scott's identity; (2) Defendants appropriated Scott's name or likeness to Defendants' advantage, commercially or otherwise; (3) Scott did not consent to the use; and (4) Scott was injured as a result. *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001); *Maxwell v. Dolezal*, 231 Cal. App. 4th 93, 96–97 (2014). Under § 3344, Scott must prove all the elements of the common law cause of action and two more: a knowing use by the defendant, and a direct connection between the alleged use and the commercial purpose. *Downing*, 265 F.3d at 1001 (citing *Eastwood v. Superior Court*, 149 Cal. App. 3d 409, 417 (1983)).

Instead of attacking these elements, Bulova raises four defenses to Scott's misappropriation claims, arguing that (1) any use by Defendants was incidental; (2) the use is protected under First Amendment principles as a matter of public interest or (3) as a transformative work; and (4) Scott is not "readily identifiable" and so his likeness has not been used. The Court addresses each.

### 1. It Is Disputed Whether Defendants' Use of Scott's Identity Was Incidental.

Bulova's first argument is that any use of Scott's identity was merely incidental and therefore not actionable. "Under California law, the 'incidental use of a plaintiff's name or likeness does not give rise to liability under a common law claim of commercial misappropriation or an action under Section 3344." *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1222, 1254 (N.D. Cal. 2014) (citing *Yeager v. Cingular Wireless LLC*, 673 F. Supp. 2d 1089, 1100 (E.D. Cal. 2009). "The rationale underlying this doctrine is that an incidental use has no commercial value, and allowing recovery to anyone briefly depicted or referred to would unduly burden expressive activity." *Yeager*, 673 F. Supp. 2d at 1100 (citing *Pooley v. Nat. Hole–In–One Ass'n*, 89 F. Supp. 2d 1108, 1112 (D. Ariz. 2000)).

Whether the incidental use exception applies is "determined by the role that the use

of the plaintiff's name or likeness plays in the main purpose and subject of the work at issue." *Id.* (quoting *Preston v. Martin Bregman Prods., Inc.*, 765 F. Supp. 116, 119 (S.D.N.Y.1991). Generally, a plaintiff's identity is not appropriated "by mere mention of it" nor where "it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him." Restatement (Second) of Torts § 652C, comment d. Factors to consider in determining whether the incidental use doctrine applies include: "(1) whether the use has a unique quality or value that would result in commercial profit to the defendant, (2) whether the use contributes something of significance, (3) the relationship between the reference to the plaintiff and the purpose and subject of the work, and (4) the duration, prominence or repetition of the likeness relative to the rest of the publication." *Yeager*, 673 F. Supp. 2d at 1100 (quoting *Aligo v. Time-Life Books, Inc.*, No. 94-cv-20707 JW, 1994 WL 715605, at *3 (N.D. Cal. Dec. 19, 1994)). "Even if the mention of a plaintiff's name or likeness is brief, if the use stands out prominently within the commercial speech or enhances the marketability of the defendant's product or service, the doctrine of incidental use is inapplicable." *Id.*

Here, Scott raises a genuine dispute about the role that his identity played in Defendants' products and advertising by offering evidence that his identity was used repeatedly and in a manner intended to take advantage of Scott's reputation. It is undisputed that Scott's name and Apollo 15 "mission commander" title[3] appeared or appear in many of Defendants' marketing materials, including the descriptions on Bulova's and Kay's websites, the promotional booklet, marketing copy for online and third-party retailers, a press release, an interview between a Baselworld reporter and Bulova's CEO Jeffrey Cohen, website advertisements, employee training materials, and internal communication documents about marketing strategy. *See* Ryan Bul. Decl. ¶ 8, Exs. A, F–L. As just one example to supplement what is described in the background section of this order, a Bulova account executive sent a "spring introduction" power point slide to a third

---

[3] As Scott notes, there was only one mission commander for Apollo 15: Scott.

party retailer, with the advertisement stating, "The Moon Pilot Chronograph is based on the design of the Bulova watch worn on the moon by Astronaut David R. Scott during 1971's Apollo 15 space mission." *Id.* Ex. H.

This evidence precludes granting summary judgment for Defendants based on incidental use. For example, in *Yeager*, the court considered a misappropriation claim where defendant Cingular Wireless used plaintiff Chuck Yeager's name in a publication by stating: "Nearly 60 years ago, the legendary test pilot Chuck Yeager broke the sound barrier and achieved Mach 1. Today, Cingular is breaking another kind of barrier with our MACH 1 and MACH 2 mobile command centers, which will enable us to respond rapidly to hurricanes and minimize their impact on our customers." *Yeager*, 673 F. Supp. 2d at 1094. This language mirrors a statement repeated frequently in Bulova and Kay's advertising: "After Apollo 15's mission commander made lunar history—while wearing his personal Bulova chronograph—we're making history again." Ryan Bul. Decl. Ex. M; *see also id.* Exs. N, O, P.

In *Yeager*, the court reasoned that the plaintiff's name and identity were "unique and non-fungible" because he was known for breaking the sound barrier for the first time, and "[t]he use of his name and identity link[ed] defendant's new technology to plaintiff's name and accomplishments" to create positive associations in customers' minds about the AT&T brand. *Yeager*, 673 F. Supp. 2d 1089. The same logic applies here. Scott's evidence permits the inference that Defendants' advertisements deliberately invoked Scott's name and historical significance as one of the first humans to walk on the moon in order to increase the Moon Watch's marketability and appeal. This is unlike, for example, *Aligo*, where the court granted a motion to dismiss based on incidental use where a plaintiff's photo was used just once for four seconds in a 29-minute infomercial and was "insignificant to the commercial purpose of selling the music anthology." *Aligo*, 1994 WL 715605, at *3.

Ultimately, the gravity of Scott's identity in Defendants' advertising—determining whether it has "a unique quality or value" that adds commercial value or "contributes

something of significance"—is a jury question. But because the evidence here permits an inference of deliberate, commercially valuable use, summary judgment for Defendants under the incidental use doctrine is not warranted.

### 2. The Undisputed Facts Do Not Establish that the Public Interest Exception Shield Defendants from Liability.

Bulova next argues that Defendants' use of Scott's identity constitutes protected speech because it is a matter of public interest. Tightly related to this argument is § 3344's "public affairs" exception, which the Court addresses in the same analysis.

"Under both the common law cause of action and the statutory cause of action, 'no cause of action will lie for the publication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it.'" *Downing*, 265 F.3d at 1001 (quoting *Montana v. San Jose Mercury News*, 34 Cal. App. 4th 790, 793 (1995)). The common law exception precludes liability for the "publication of matters in the public interest," *Montana*, 34 Cal. App. 4th at 794–95, and the statutory exception excludes liability for "a use of a name, voice, signature, photograph, or likeness in connection with any . . . public affairs . . ." Cal. Civ. Code § 3344(d).

These defenses are state law creations and not coextensive with the federal Constitution, but both "are based on First Amendment concerns." *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1282 (9th Cir. 2013). Courts that consider both exceptions consistently either analyze them together or reach the same outcome on both. *See, e.g.*, *Montana*, 34 Cal. App. 4th at 794–95 (analyzing both in a single analysis); *Dora*, 15 Cal. App. 4th at 545–46 (referencing its common law public interest analysis to reach the same conclusion on the statutory public affairs analysis); *McKinney*, 2013 WL 5617125, at *20 (same). The Court therefore considers the "public interest" and "public affairs" defenses together as a single inquiry grounded in First Amendment concerns.

As an overarching starting point, First Amendment principles dictate that commercial speech receives less protection than non-commercial speech. *Bolger v. Youngs*

*Drug Prod. Corp.*, 463 U.S. 60, 65 (1983). Defendants here do not dispute that the materials containing Scott's identity are for a commercial purpose. *See* Bul. MSJ at 14–16. Thus, these materials are subject to reduced free speech protection relative to non-commercial speech.

To balance a plaintiff's privacy and publicity rights against the public's free speech interest in dissemination of news and information, courts must consider "the nature of the precise information conveyed and the context of the communication." *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 410. Regarding the nature of the information conveyed, Apollo 15 and space exploration certainly implicate some degree of public interest, satisfying the first prong of this inquiry. But the crux of this case is the second prong: context.

The determinative inquiry for whether the public interest exception applies to commercial speech is whether a defendant's use of a plaintiff's identity is the commercial product itself, or is instead used to promote some other tenuously related product. A case involving another famous space pioneer illustrates the idea. In *Aldrin v. Topps Company*, the court considered whether, under California's anti-SLAPP statute, a set of trading cards depicting well-known "American Heroes" amounted to constitutionally protected free speech on an issue of public interest. *Aldrin v. Topps Co., Inc.*, No. 10-cv-09939 DDP FMOX, 2011 WL 4500013, at *2–3 (C.D. Cal. Sept. 27, 2011). The cards' packaging displayed the "Visor Shot" of astronaut Buzz Aldrin on the moon—"arguably the world's most famous space-related photo"—and included other images and descriptions of Aldrin on the cards. *Id.* at *1. One card included a historical account of how Aldrin helped actualize NASA's aspirations for extra-vehicular astronaut activity and advanced national ambitions to "shoot for the moon." *Id.* The court took note of the fact that the cards' primary purpose was to disseminate historical information, and it distinguished from cases in which famous persons' identities were used to promote products that "bore no relationship to those individuals or their activities, and conveyed no message other than information about the unrelated products." *Id.* at *3. Because the Topps cards "propose[d]

no commercial transaction, and [were] not advertisements for any product," the court found that the commercial product was the speech itself, and was therefore protected by the First Amendment. *Id.* at *3.

A California appellate court reached a similar conclusion about commercial reprints of three newspaper pages. After the San Francisco 49ers won the 1989 and 1990 Superbowls, the San Jose Mercury News published three front page stories containing photos and renderings of quarterback Joe Montana. *Montana*, 34 Cal. App. 4th at 792. The Mercury reproduced each of these front page stories in poster form and distributed them as promotional materials to the public to showcase the quality and content of the newspaper. *Id.* In response, Montana sued the Mercury under California's misappropriation laws. Noting the substantial free speech interest in the press, the court found that, because the posters were simply unaltered reprints of the Mercury's own constitutionally protected news story, the commercial re-use of those articles (and therefore Montana's identity) was also protected. *Id.* at 797. Key to this conclusion is that, like in *Aldrin*, the commercial product was the speech itself: a newspaper story about the plaintiff.

In contrast, the Ninth Circuit in *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 416 (9th Cir. 1996), found that the commercial use of Lew Alcindor's name and basketball record in a car commercial was not protected by § 3344(d). The court acknowledged that "Alcindor's basketball record may be said to be 'newsworthy,'" but it held that § 3344(d) did not apply because the defendant "used the information in the context of an automobile advertisement" rather than to disseminate newsworthy information. *Abdul-Jabbar*, 85 F.3d at 416. Thus, the court was not persuaded to apply the exception where the plaintiff's likeness was used merely to promote an unrelated, non-speech product.

Like *Abdul-Jabbar*, the Ninth Circuit held in *Downing* that Abercrombie's use of several plaintiffs' photos in a surfing-themed catalog did not fall under the public interest exception. *Downing*, 265 F.3d at 1002–03. In a section of the catalog entitled "Surf Nekkid," a photo of the plaintiffs surfing was sandwiched between articles on the history of surfing and an advertisement for "Final Heat Tees," which Abercrombie created to look

"exactly like those worn by the [plaintiffs] in the photograph." *Id.* at 1000. The Ninth

Circuit distinguished the case from *Dora*, 15 Cal. App. 4th 536, in which the court applied

the public interest exception to a documentary about the famous surfer Mickey Dora. The

Ninth Circuit in *Downing* reasoned:

> Although the theme of Abercrombie's catalog was surfing and surf culture, a matter
> of public interest, the use of [the plaintiffs'] names and pictures is quite different
> from that involved in the *Dora* case. In *Dora*, Mickey Dora's contribution to the
> development of the surf life-style and his influence on the sport was "the point of
> the program." Dora was depicted in the documentary because his identity directly
> contributed to the story about surfing which came within the protected public
> interest.
>
> In the current action, there is a tenuous relationship between [the plaintiffs']
> photograph and the theme presented. Abercrombie used [the plaintiffs'] photograph
> essentially as window-dressing to advance the catalog's surf-theme.

*Downing*, 265 F.3d at 1002 (internal citation omitted). Thus, the Ninth Circuit

expressly distinguished between the use of Mickey Dora's identity as the commercial

product itself—a documentary—and the use of the *Downing* plaintiffs' photos as a mere

"window-dressing" to sell Abercrombie clothes. *Id.*

The case here is distinct from all of the examples above, but ultimately falls closest

to *Downing* and *Abdul-Jabbar*. The key point is that, unlike *Aldrin*, *Montana*, and *Dora*,

Defendants' product is not speech. Defendants did not sell an informational piece of

media—fact-based trading cards, a newspaper, or a documentary—about Apollo 15 or

space exploration. The commercial product is a watch, and the references to history and

space exploration simply help to sell it.

What makes this a closer case is that the relationship between the plaintiff and the

product is somewhat less tenuous than in *Abdul-Jabbar* and *Downing*; Scott actually wore

a Bulova watch to the moon. In *Downing*, the t-shirts that Abercrombie advertised were

designed to look "exactly like those worn by the [plaintiffs] in the photograph," but there is

no indication that Abercrombie made the original t-shirts. *Id.* at 1000. Here, Bulova's

Moon Watch replicates the original chronograph that Scott wore on the moon, and Bulova

made the chronograph.

What compels the Court to follow *Downing* on this point, despite the difference in facts, is the fine line that must be drawn between the historical event that was Apollo 15 and the person that is David Randolph Scott. The fact that Bulova manufactured Scott's original chronograph certainly gives Bulova greater license to boast about its connection to the Apollo 15 mission. But whatever connection the original chronograph created between Bulova and Apollo 15 does not automatically make Scott fair game.

The difference between calling forth Apollo 15 and referencing Scott is illustrated in the second and third versions of Bulova's online description for the Moon Watch. Strongly invoking Scott's success, the second online description stated: "After Apollo 15's mission commander made lunar history—while wearing his personal Bulova chronograph—we're making history again." Napolitano Decl. Ex. 4. The third online description changed course to state: "Bulova made space history on August 2, 1971— during the Apollo 15 mission, a moon pilot chronograph, customized for lunar conditions by Bulova engineers, was worn on the moon." *Id.* Ex. 5. From the second to third version, the emphasis moves away from mission commander Scott and toward Bulova's own involvement in the historical event of the Apollo 15 mission.

Somewhere in that continuum there is a line. While Bulova may legally showcase its legitimate connection to Apollo 15, the Court cannot say as a matter of law that Defendants' advertisements do not cross the event horizon into the black hole of misappropriation. Instead, following *Downing*, the Court finds that Scott the astronaut, as distinguished from the Apollo 15 mission or space exploration more generally, bears too tenuous a connection to the non-speech commercial Moon Watch for the public interest exception to shield Defendants from liability on summary judgment.

### 3. Defendants' Remaining Arguments Do Not Apply to At Least Some Alleged Uses.

Defendants offer two final defenses against Scott's appropriation claims, but both arguments apply to only some of Defendants' alleged uses of Scott's identity. First,

Defendants argue that the marketing booklets included with the watch's packaging, the online watch descriptions, and the 79-second advertising video contain significant transformative elements, making them exempt from liability. Second, Defendants assert Scott is not "readily identifiable" in the photograph of him on the moon, making the photo and the materials containing the photo not actionable under § 3344.

Neither argument is grounds for summary judgment, because their applicability to Scott's misappropriation claims is incomplete. Scott identifies other uses of his identity that these arguments do not encompass. For example, Scott provides evidence that Defendants used his name and identity in interviews, press releases, internal communications incorporating Scott's identity into the Moon Watch's branding (e.g., training materials), public Wikipedia page edits, and a certificate of authenticity issued along with the watch. *See* Ryan Bul. Decl. Exs. F–L, Q–S, V. Thus, even if the booklets, watch descriptions, and video were transformative, and even if Scott were not readily identifiable in the disputed photograph, the remaining components of Scott's claim would survive summary judgment. Because the result is the same no matter how these issues are resolved, the Court will skip the Morton's fork and decline to reach Bulova's arguments on transformative character and identifiability.

In sum, Bulova's arguments on incidental use, the public interest exception, transformative character, and identifiability all fail. Bulova's motion for summary judgment on Scott's common law and statutory appropriation claims is DENIED.

## B. Scott's Lanham Act Claims Involve Disputed Material Facts.

Bulova next moves for summary judgment on Scott's Lanham Act claims for false designation of origin and false advertising. The Lanham Act imposes liability on:

> [a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or

commercial activities by another person, or
(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

15 U.S.C. § 1125(a)(1).

### 1. Scott's False Designation of Origin Claim Involves Disputed Material Facts.

The gravamen of Scott's false designation of origin claim is that Defendants' Moon Watch advertisements falsely imply endorsement or approval by Scott. Bulova counters with three arguments: (1) that Scott does not have a trademark on which to base his Lanham Act claims because he does not use his name to identify trademarked goods or services; (2) that there is no possibility of consumer confusion; and (3) that the inclusion of Scott's identity in advertisements is non-actionable nominative fair use.

### a. There Is Evidentiary Support that Scott Has a Lanham Act "Mark."

On the first argument, Bulova is wrong as a legal matter. Scott does not, as Bulova argues, need to have a registered trademark for products that he is marketing or selling. In a false endorsement case involving a celebrity, the "mark" is the celebrity's "persona," and the "strength" of the mark refers to "the level of recognition the celebrity enjoys among members of society." *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1400 (9th Cir. 1992). It is undisputed that Scott was the seventh man to walk on the moon, and Scott presents evidence that he is recognizable in society. *See* Ryan Bul. Decl. Ex. HH. Thus, it is at least factually disputed whether Scott has a "mark" for his Lanham Act claims.

### b. Likelihood of Confusion Is Factually Disputed.

As to the second argument, the Ninth Circuit has articulated eight factors to consider in determining whether there exists a likelihood of confusion in celebrity endorsement cases:

1. the level of recognition that the plaintiff has among the segment of the society for whom the defendant's product is intended;

2. the relatedness of the fame or success of the plaintiff to the defendant's product;
3. the similarity of the likeness used by the defendant to the actual plaintiff;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent on selecting the plaintiff; and
8. likelihood of expansion of the product lines.

*Downing*, 265 F.3d at 1007–08. These factors' relevance and importance vary from case to case, and the "likelihood of confusion standard is predominantly factual in nature." *Id.* at 1008 (*quoting Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 812 (9th Cir. 1997)).

Here, Scott offers ample evidence to raise a triable factual issue. Most compellingly, Scott offers evidence that at least some consumers knew of Scott and his role in Apollo 15, were excited to buy the watch because of its connection to Scott, and may actually have believed Scott endorsed the product. For example, a consumer review on Bulova's website reads, "[I] found out [t]hat other than the NASA Swiss watch, one other watch had been worn on the [m]oon by [t]he Commander of Apollo 15 'Dave Scott' on EVA 2. The watch in question was the Bulova 96B251 Moon Watch." Ryan Bul. Decl. Ex. HH. Similarly, a Facebook user referred to the Moon Watch as the "Dave Scott Re-Edition." *Id.* Ex. DD. In addition to this evidence, and as discussed in the context of Scott's misappropriation claims, there is a clear link between the Moon Watch and why Scott is famous. While this link is too tenuous to establish the public interest defense on Scott's misappropriation claims, it is entirely reasonable to infer that Defendants' reference to the Moon Watch, Apollo 15, and Scott in the same breath could confuse consumers about Scott's role in the Moon Watch's marketing. Also persuasive is the fact that Defendants used unaltered images of Scott (though it is disputed whether Scott was readily identifiable in those photos), along with his name and official title. The "similarity" of his likeness was therefore exact rather than, say, a caricature. Finally, Scott's evidence shows that Bulova may have actively sought Scott out to serve as a "brand ambassador," suggesting intentionality in Bulova's decision to select Scott in their advertising. *See*, *e.g.*, *Id.* Ex. Z (Email from Bulova's CEO saying, "We are planning to sign David Scott as a

Bulova ambassador for this model.").

Thus, the first, second, third, fourth, and seventh factors involve disputed factual issues, with substantial evidentiary support for Scott's position. Because a jury could reasonably conclude that there is a likelihood of confusion, summary judgment for Defendants is not warranted on these grounds. *See Downing*, 265 F.3d at 1008.

### c.  Nominative Fair Use Is Factually Disputed.

Bulova's final argument against Scott's false designation of origin claim is that Defendants' advertisements fall within the non-actionable category of nominative fair use. A commercial user of another's trademark is entitled to a nominative fair use defense when three requirements are met: (1) "the product or service in question must be one not readily identifiable without use of the trademark"; (2) "only so much of the mark or marks may be used as is reasonably necessary to identify the product or service"; and (3) "the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).

The nominative fair use defense does not entitle Defendants to summary judgment here for two reasons. First, the Ninth Circuit clarified in *New Kids* that the test applies only "where the defendant uses a trademark to describe the plaintiff's product, rather than its own." *Id.* at 308; *accord Downing*, 265 F.3d 1009. Here, Defendants used Scott's identity to describe their own product, not Scott's. Second, even if the test is applied, the third factor is factually disputed. As noted above, Scott offers evidence that consumers may have believed Scott endorsed or sponsored the Moon Watch, referring to it as the "Dave Scott Re-Edition" and retelling in favorable online reviews the story of Scott taking his personal Bulova chronograph to the moon. Whether Defendants' advertisements suggests sponsorship or endorsement by Scott is a highly factual matter and not suitable for summary judgment. *See Downing*, 265 F.3d at 1009 (reversing summary judgment where there was "a genuine issue of material fact as to whether the third criterion is met").

In sum, none of Defendants' three arguments warrants summary judgment. The

motion is DENIED as to Scott's false designation of origin claim.

**2. Scott's False Advertising Claim Involves Disputed Material Facts.**

Scott's other Lanham Act claim is for false advertising, which requires a plaintiff to show:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product;
> (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience;
> (3) the deception is material, in that it is likely to influence the purchasing decision;
> (4) the defendant caused its false statement to enter interstate commerce; and
> (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012). Bulova attacks only the first and fifth elements, arguing that no false statements were ever made in the Moon Watch advertising, and that Scott cannot show any injury. Bul. MSJ at 24. Scott responds that the characterization of the Moon Watch as a "replica" is false because the internal components of the Moon Watch differ from the original chronograph and is not a "100%" replica according to Bulova's own 30(b)(6) witness. Opp. to Bul. MSJ at 23 (citing Ryan Bul. Decl. Ex. A (Napolitano Depo.)). For the fifth element, Scott points to his own testimony that he has been injured—presumably economically in this context—by being associated with a watch that he would not endorse, and points to Doug Bania's expert declaration that Scott has lost potential income from future endorsement deals. *Id.* at 24 (citing Scott Decl. ¶¶ 10–15 and Bania Decl. ¶ 8).

Whether Defendants' characterization of the Moon Watch as a "replica," despite mechanical differences between the watches, is a materially false statement that would mislead consumers into buying the watch and harm Scott in the process is a factual question for the jury. Summary judgment on this claim is DENIED.

**C.    Scott's Negligence Claim Entails Disputed Factual Issues.**

Scott's sixth cause of action, negligence, is a duplicative recasting of his

misappropriation claims. *See* FAC ¶ 48–50 (asserting that Defendants owed Scott a duty "to do nothing which might harm his interests" and breached that duty by "utiliz[ing]" Scott's "name and likeness on marketing material to promote Defendants' products"). The same factual disputes present in Scott's misappropriation claims therefore apply in equal force here. While the Court remains perplexed why Scott insists on pursuing a claim that adds nothing to the case, this supernovic white dwarf star of a claim burns on. Bulova's motion for summary judgment on Scott's sixth cause of action is DENIED.

### D. Summary Judgment Is Warranted on Scott's Emotional Distress Claims.

Scott's seventh and eighth causes of action are for intentional infliction of emotional distress and negligent infliction of emotional distress, respectively. As to the latter, "[t]he 'negligent causing of emotional distress is not an independent tort but the tort of negligence, involving the usual duty and causation issues.'" *Huntingdon Life Scis., Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.*, 129 Cal. App. 4th 1228, 1264 (2005) (citing 6 Witkin, Summary of Cal. Law (9th ed.1988), Torts, § 838, p. 195.). This means that "damages for emotional distress are recoverable only if the defendant has breached some other duty to the plaintiff." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 984 (1993). Thus, Scott's negligent infliction of emotional distress claim cannot stand alone and is subsumed by his general negligence claim. Furthermore, as discussed below, the evidence does not support a claim for severe emotional distress, so Scott's eighth cause of action is untenable on two bases.

Regarding Scott's seventh cause of action, "[t]o prevail on a claim for intentional infliction of emotional distress, the plaintiff must prove the following: (1) the defendants' conduct was outrageous; (2) the defendants intended to cause, or recklessly disregarded the likelihood of causing, emotional distress; (3) the plaintiff experienced severe emotional suffering; and (4) actual and proximate cause of emotional distress." *Newcombe*, 157 F.3d at 696 (citing *Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal. 3d 148, 155 n.7 (1987)). "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Fletcher v. W. Nat'l Life Ins. Co.*, 10 Cal. App. 3d 376,

397 (1970).

Typically, "[i]t is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed." *Fletcher*, 10 Cal. App. 3d at 397 (quoting Rest. 2d Torts, § 46, com. j). Here, severe emotional distress cannot be found on the evidence presented. The lone evidence purporting to demonstrate severe emotional distress is Scott's declaration stating, "I have suffered emotionally because people may now believe I have abandoned my private life in favor of commercially promoting products which is not how I wish to be perceived by the public," and, "I feel humiliated, embarrassed, and mentally distressed because of the new public persona Bulova and Kay's have forced upon me; an Apollo astronaut that endorses products, let alone a cheap and deceptive product." Scott Decl. (ECF 102-2) ¶¶ 12, 13. This solitary declaration is insufficient to raise a triable factual issue because it describes at worst discomfort with a social image Scott fears he may have. Even viewed in the light most favorable to Scott, this evidence is a parsec away from describing distress that no reasonable person can be expected to endure. Furthermore, there is no evidence to speak of showing that Defendants were intentional or reckless in the emotional harm they allegedly caused to Scott. The Court therefore GRANTS Bulova's motion for summary judgment on Scott's seventh and eighth causes of action. *See Newcombe*, 157 F.3d at 696 (affirming summary judgment for defendants where the evidence did not support a finding of intentionally outrageous conduct).

### E. Kay's Separate Summary Judgment Motion Is Denied to the Extent It Surpasses Bulova's.

Kay moves separately for summary judgment, joining Bulova's motion and putting forth additional grounds to excuse itself from liability. The motion boils down to a single unpersuasive argument that because Kay "had no role in authoring any of the watch descriptions," it is just an "innocent retailer." Kay MSJ at 4.

Relying on New York state law, an Eleventh Circuit decision interpreting Florida law, and a case from the District of Columbia, Kay first argues that misappropriation

claims do not apply to passive downstream distributors. Kay's out-of-state caselaw is unpersuasive. No party nor the Court has identified Ninth Circuit or California law holding that downstream retailers cannot be held liable under California common law or statutory appropriation claims, and the Court will not invent such a rule here.

Next, Kay claims it is innocent because Bulova contractually agreed to ensure compliance with applicable law and secure necessary permissions and releases from third parties. *Id.* (citing Sharma Decl. (ECF 94) ¶ 3, Ex. A). Kay's purchasing agreement with Bulova does not change the equation because those parties' private contractual allocation of legal responsibility does not affect Scott's rights as a third party. *See Vitale & Assocs., LLC v. Lowden*, 690 F. App'x 555, 556–57 (9th Cir. 2017) ("[I]n general, 'a contract cannot bind a nonparty.'") (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)).

Kay also points to the statutory provision that narrows § 3344 liability for "the owners or employees of any medium used for advertising, including, but not limited to, newspapers, magazines, radio and television networks and stations, [etc.]" Cal. Civ. Code § 3344(f). But § 3344(f) does not apply to Kay, because Kay is not an advertising medium like a newspaper or television station. It is a business that uses advertisements to market its goods. On its face, § 3344(f) does not shield Kay from liability.

Finally, on Scott's Lanham Act claims, Kay argues it is not liable under a theory of contributory infringement, because it did not exercise control over Bulova's product or advertisements. There are two versions of contributory infringement. In the "product" version, contributory infringement attaches to a party that intentionally induces another to infringe on a trademark, or to an upstream supplier that provides a product knowing the downstream recipient is using it to infringe a trademark. *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir.1996) (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854–55 (1982)). Under the "service" version that applies here, when a defendant supplies an alleged infringer with a service (like a venue to sell wares) rather than a product, the defendant must exercise "[d]irect control and monitoring of the

instrumentality used by [the] third party to infringe the plaintiff's mark." *Lockheed Martin*, 194 F.3d at 984.

Whether offered as proof of direct infringement or the "service" version of contributory infringement, Scott provides evidence that Kay edited the Moon Watch description that Kay used on its website, and that it exercised significant control over which promotional materials to use in its store displays. *See* Ryan Kay Decl. Ex. B.; Ryan Bul. Decl. Ex. U. Kay does not dispute that it chose which materials to display in its stores or that it edited the watch description it posted on its website. Instead, Kay argues that the only changes it made to the watch description were "minor edits to technical specifications of the watch." Kay Reply at 5. This concession is fatal to Kay's position because, whether or not it actually chose to change the language relating to Scott, Kay clearly had a volitional role in creating and displaying the allegedly infringing advertising materials. At the very least, Scott raises a genuine factual dispute about Kay's "innocence."

For all these reasons, Kay's separate motion for summary judgment is DENIED to the extent it surpasses Bulova's. To the extent it merely joins Bulova's motion, the same conclusions apply: it is GRANTED on Scott's emotional distress claims and DENIED as to the remaining claims.

## IV. CONCLUSION

Defendants' motions for summary judgment are GRANTED on Scott's seventh and eighth causes of action for intentional and negligent infliction of emotional distress. The motions are DENIED on Scott's remaining claims.

The claims that survive are Scott's first, second, and third causes of action for common law and statutory appropriation; fourth and fifth causes of action for false advertising and false designation of origin under the Lanham Act; and sixth cause of action for negligence.

**IT IS SO ORDERED.**

Dated:  April 4, 2018

_____
NATHANAEL M. COUSINS
United States Magistrate Judge